UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| FIRST-CITIZENS BANK & TRUST, COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL ONORATO and CIBC PRIVATE WEALTH ADVISORS, INC. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Case No. 25-cv-11331-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                   **August 1, 2025**

**I.   Introduction**

Plaintiff First-Citizens Bank & Trust Company ("First Citizens") has filed this lawsuit against Michael Onorato ("Onorato") and CIBC Private Wealth Advisors, Inc. ("CIBC") (collectively, "Defendants") for injunctive relief and damages alleging various claims. First Citizens now has moved for a preliminary injunction to enjoin the Defendants from engaging in the solicitation of any client or prospective client of First Citizens that Onorato serviced or communicated with during his employment at First Citizen or about whom Onorato learned any confidential information during his employment with First Citizens, disclosing and/or authorizing the disclosure of or using for their own benefit any trade secrets or confidential information belonging to First Citizens including client lists and contact information and to seek the return of First Citizens's trade secrets and confidential information. D. 2; D. 2-1; D. 3 at 1. First Citizens also has moved for leave to conduct expedited discovery. D. 4. For the reasons discussed below,

the Court DENIES First Citizens's motion for injunctive relief, D. 2, and DENIES First Citizens's motion for expedited discovery, D. 4.

**II.    Standard of Review**

The Court recognizes that preliminary injunctive relief "is an 'extraordinary and drastic remedy.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). To obtain such relief, the Court must consider: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996)). "[L]ikelihood of success [on the merits] is the main bearing wall of this framework." W Holding Co. v. AIG Ins. Co. Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014) (internal quotation marks omitted) (quoting Ross-Simons of Warwick, Inc., 102 F.3d at 16). Irreparable harm, on the other hand, is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on the irreparable harm depends in part on the degree of likelihood of success shown." Gedeon v. City of Springfield, No. 16-cv-30054-MGM, 2017 WL 4212334, at *8 (D. Mass. Feb. 24, 2017) (quoting Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 622 F.3d 36, 42-43 (1st Cir. 2010)). The movant "bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) (citing Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)).

**III.    Factual Background**

First Citizens provides private banking, lending, brokerage and wealth management and

investment advisory services to its clients. D. 1 ¶¶ 1, 14. While employed by a predecessor of First Citizens, Onorato worked with Richard Mullaney ("Mullaney") for approximately five years. D. 12-1 ¶ 9; D. 12-2 ¶ 11. During that time, Onorato and Mullaney, now CIBC Senior Relationship Manager, worked closely together and shared a client base, which came with access to the clients' identities and contact information. D. 1 ¶ 47; D. 12-1 ¶ 10. D. 12-2 ¶ 11.

Onorato first worked at First Citizens as a Senior Wealth Advisor, id. ¶ 23, and was later promoted to a Managing Director. Id. ¶ 28. In conjunction with and in consideration of Onorato's employment with a predecessor of First Citizens, on February 26, 2015, Onorato executed a Non-Solicitation & Confidentiality Agreement. D. 1 ¶ 32. On May 2, 2021, in exchange for the right to participate in a lucrative incentive compensation plan, Onorato signed a Non-Solicitation and Confidentiality Agreement ("Non-Solicitation Agreement"). Id. ¶ 33. Under the terms of the Non-Solicitation Agreement, Onorato agreed that, both during his employment at First Citizens and all times after, he would "keep secret and retain in strictest confidence, and [would] not disclose or use, other than in the performance of [his] responsibilities for [First Citizens], any Confidential Information." Id. ¶ 34. Under the Non-Solicitation Agreement, Onorato further agreed that, in the event that he chose to resign or retire from First Citizens, he would provide First Citizens with ninety (90) days written notice of his intent to do so (the "Notice Period"). Id. ¶ 36. The Non-Solicitation Agreement also required that Onorato, both during his employment and for a period of one year thereafter, shall not directly or indirectly solicit customers, clients or prospects of First Citizens to do business with any person or entity that is competitive with First Citizens or induce or advise any customer, client or prospect to withdraw, curtail or diminish its business with First Citizens. Id. ¶ 38.

When Onorato became a Managing Director at First Citizens, he had the responsibility of

managing assigned clients' accounts and was allowed to access, use and develop First Citizens's proprietary and confidential information. Id. ¶¶ 29-30. On December 20, 2024, Onorato accepted a position at CIBC and gave his 90-day notice to First Citizens. Id. ¶ 40; D. 12-1 ¶ 11. CIBC is a financial planning and investment advisory company that is competitive with First Citizens as it handles private wealth management. D. 1 ¶ 45. Up until his resignation, Onorato worked out of First Citizens' Boston office. Id. ¶ 31.

As First Citizens wealth advisors assigned to take over the accounts serviced by Onorato began to contact clients, they heard from many clients that Onorato was leaving to go to CIBC. Id. ¶ 44. First Citizens alleges that the only way that clients could have known about Onorato's resignation and future employment with CIBC is because Onorato told them. Id. ¶ 46. On December 23, 2024, less than a week after Onorato informed First Citizens of his plan to resign, one First Citizens client received an unsolicited email from Mullaney. Id. ¶ 47. Mullaney noted his "shared history" with the client and provided information about CIBC. Id. The client immediately emailed Onorato at his First Citizens email address and asked for an explanation. Id. Later that same day, the client responded, copying Onorato, and advised Mullaney that he was free to call or text him after the start of the new year. Id. ¶ 48. On December 30, 2024, a new First Citizens advisor emailed the same client to introduce himself, and the client wrote to Onorato asking, "[a]dvice on best way to decline? And to be fiscally prudent and professionally correct? And, presumably, to move assets seamlessly?" Id. ¶ 49. On December 26, 2024, another First Citizens client wrote to Onorato at his First Citizens email address and declared: "I am sure you had a wonderful Christmas and will have a great New Year. After [] all, you have made a bi[g] decision – and glad it's behind you. So you're OUT but we are still IN. How do we get anything done? Who do we talk to?" Id. ¶ 50. On January 3, 2025, a First Citizens client who had recently

4

asked for a copy of his statements forwarded them to Mullaney at CIBC via email, with a copy to Onorato's First Citizens' email account, noting "Hope this is what you need." Id. ¶ 51. On January 8, 2025, another First Citizens client, after requesting a copy of her account statements, informed First Citizens that she and her husband "have decided to transfer our account to CIBC and continue with Mike Onorato when he starts with that firm." Id. ¶ 52.

On January 28, 2025, First Citizens wrote to Onorato to "(1) remind him of his contractual legal obligations both during and after the Notice Period, (2) identify breach of those obligations that had occurred, and (3) demand that Onorato cease his misconduct and confirm his intent to comply with those obligations going forward." Id. ¶ 53; D. 1-3. On January 30, 2025, Onorato responded to confirm that he understood and would comply with his obligations, and noted that CIBC understood his obligations. D. 1 ¶ 54; D. 1-4. First Citizens wrote to Onorato again and CIBC on March 4, 2025 in another attempt to stop what it characterizes as the "continuing harm" of solicitations by Onorato. D. 1 ¶¶ 55-56; D. 1-5. Onorato's employment with First Citizens ended on March 19, 2025. D. 1 ¶ 58.

Onorato asserts that First Citizens cut off access to Onorato's company email and resources almost immediately after he submitted his notice of resignation and that he did not work during the Notice Period unless First Citizens employees asked him specific questions. D. 12-1 ¶¶ 13-14. He also asserts that he did not reach out to his clients to inform them that he had resigned from First Citizens and that he told them, if clients reached out to him, that "changes are coming" or words to that effect. Id. ¶ 14. Onorato asserts that when he left his position at First Citizens, he did not take the company's confidential information or trade secrets with him. Id. ¶ 15. According to Mullaney, when he first learned from CIBC that Onorato would be joining the company, he contacted some of his former clients. Id. ¶ 12. Mullaney asserts that he is familiar

5

with those clients and that he had their information on his personal cell phone, which he used while employed at First Citizens's predecessor. Id. ¶ 13. Mullaney attests that Onorato did not tell him the names of his clients. Id. Mullaney's Non-Solicitation Agreement with Boston Private, signed around May 2, 2021, has expired and he has not been employed by First Citizens for over a year. D. 12-2 ¶¶ 4, 10.

### IV. Procedural History

First Citizens commenced this action against Defendants on May 12, 2025, D. 1, and on the same day moved for injunctive relief, D. 2. First Citizens also moves for leave to conduct limited expedited discovery. D. 4. The Court heard the parties on the pending motions and took the matters under advisement. D. 26.

### V. Discussion

#### A. Likelihood of Success on the Merits

Although the Court considers all factors of the preliminary injunction analysis, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). Where the factual record is contested, particularly as to the key consideration of likelihood of success on the merits, a preliminary injunction may not be proper. See Spencer Co., 489 F.2d at 707; Guevara-Salgado v. Hayes-Meninno, LLC, No. 15-12294-PBS, 2016 WL 3774195, at *1 (D. Mass. Feb. 5, 2016).

##### 1. Choice of Law

The Non-Solicitation Agreement includes a provision that provides "[t]his Agreement shall be construed in accordance with and governed by the substantive laws of the Commonwealth of

Massachusetts without regard to conflict of law provisions." D. 1-2 ¶ 13. Defendants, however, contend that the Non-Solicitation Agreement is void and unenforceable pursuant to Cal. Bus. & Prof. Code § 16600.1, a California statute barring and voiding noncompete and non-solicitation clauses and agreements, because Onorato was employed by SVB, a California company, during the statute's "look-back period" (January 1, 2022 through March 2023). D. 12 at 5-6.

To determine which state's substantive law applies to a breach of contract claim (like Count I here against Onorato), the Court looks to Massachusetts choice of law principles because the Commonwealth is the forum state. See NuVasive v. Day, 954 F.3d 439, 443 (1st Cir. 2020). Massachusetts courts will typically give effect to a contractual choice-of-law clause. See, e.g., Morris v. Watsco, Inc., 385 Mass. 672, 674 (1982). Massachusetts courts, however, will not honor a choice-of-law provision where "'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or [where] application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state [in the determination of the particular issue]' and is the State whose law would apply . . . 'in the absence of an effective choice of law by the parties.'" Oxford Glob. Res., LLC v. Hernandez, 480 Mass. 462, 469 (2018) (quoting Restatement (Second) of Conflict of Laws § 187(2) (1971)).

Here, Massachusetts has a substantial relationship to the contract and the parties where Onorato was working in the Boston office. D. 1 ¶¶ 23, 31; see Restatement (Second) of Conflict of Laws § 187(2) cmt. f (1971) (noting that there is a "substantial relationship" between the state and the parties or the contract "where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business"). Per an attachment to the Non-Solicitation Agreement, Onorato acknowledged that he is "considered to be employed 'based'

in the location of the Company office where [he] regularly perform[s] services for the Company," in this case Massachusetts, and that "[o]nce [his] employment with the Company ends, the state in which [he] is considered to be based is not affected by any subsequent relocation." D. 1-2 at 9.

The second exception to the enforceability of the parties' choice-of-law provisions is likewise inapplicable here, where California law would not apply in the absence of the provision and California does not have "a materially greater interest" than Massachusetts in this litigation. Oxford Glob. Res., 480 Mass. 469. In determining which state law would apply in the absence of a choice-of-law provision, Massachusetts courts look to "the most significant relationship to the transaction and the parties" and consider "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Id. at 467 (internal citations and quotation marks omitted); DraftKings Inc. v. Hermalyn, 732 F. Supp. 3d 84, 108 (D. Mass. 2024) (applying Massachusetts's choice of law principles to determine Massachusetts law, not California law, was applicable to noncompetition, non-solicitation and non-disclosure agreements). Nothing in the present record suggests that California, and not Massachusetts, is the (a) place of contracting, (b) negotiation, (c) performance or (d) location of the subject matter of the contract or (e) the parties. Defendants argue that because the Non-Solicitation Agreement executed between Onorato and Boston Private became SVB's Non-Solicitation Agreement with Onorato once SVB, a California company, acquired Boston Private and employed Onorato during the "look-back" period, the Non-Solicitation Agreement is void pursuant to California law. D. 12 at 6. This argument ignores the agreement's choice-of-law provision and the incorporated attachment, which delineates modifications for "employees of the Company based in *California.*" D. 1-2 ¶ 13 & at 9-11 (emphasis in original). Moreover,

Defendants do not argue that application of Massachusetts law would be contrary to California's public policy against the enforcement of noncompetition agreements. See DraftKings Inc., 732 F. Supp. 3d at 108 (noting that "Massachusetts likewise has adopted a considered legislative policy" and that "noncompetition agreements must meet minimum requirements to be valid and enforceable") (internal citation and quotation marks omitted), aff'd, 118 F. 4th 416, 422-23 (1st Cir. 2024) (noting that Massachusetts and California's statutes "reflecting different but careful balances of conflicting forces in the noncompete area" did not mean that California had a "materially greater interest").

For the reasons aforementioned, the Court will apply Massachusetts law in considering the validity and enforceability of the Non-Solicitation Agreement.

### 2. *Validity and Enforceability of Non-Solicitation Agreement*

First Citizens has established a likelihood of success on the merits as to the enforceability of the Non-Solicitation Agreement. Under Massachusetts law, a restrictive covenant such as non-solicitation agreement "is only reasonable, and thus enforceable, if it is (1) necessary to protect a legitimate business interest, (2) reasonably limited in time and space, and (3) consonant with the public interest." Automile Holdings, LLC v. McGovern, 483 Mass. 797, 808 (2020); Oxford Global Resources, LLC v. Hernandez, 480 Mass. 462, 471 (2018) (observing that the "same principles" apply to both noncompetition and non-solicitation provisions). "In the employer-employee context, the legitimate business interests that may be protected consist of trade secrets, confidential information, and good will." Automile Holdings, 483 Mass. at 810.

Here, the Non-Solicitation Agreement prohibits Onorato from soliciting any customer, client or prospect "of [First Citizens] to do business with any person or entity (other than [First Citizens]) that is competitive with the [First Citizens's] business" or transacting business with any

customer, client or prospect "of [First Citizens] for the benefit of any person or entity (other than [First Citizens]) that is competitive with [First Citizens's] business" for one year of Onorato's date of termination of his employment. D. 1-2 ¶ 4(a). The "Confidentiality Information" provision also requires that, both during his employment and thereafter, Onorato "shall keep secret and retain in strictest confidence, and shall not disclose or use, other than in the proper performance of my responsibilities for [First Citizens], any Confidential Information." Id. ¶ 1. First Citizens cites various cases where courts have enforced restrictive covenants of similar scope and length. D. 3 at 9 (and cases cited). First Citizens has a cognizable and legitimate business interest in protecting its client relationships, goodwill and confidential information and, as Managing Director, Onorato had access to First Citizens's confidential information about clients' identities and contact information, pricing and strategies. See D. 1 ¶¶ 15, 18, 29-30; Nuance Communications, Inc. v. Kovalenko, No. 22-cv-10656-DJC, 2022 WL 2347112, at *5 (D. Mass. June 29, 2022) (legitimate business interest when employee was exposed to array of confidential documents concerning business strategy, customer programs, client development, and product development); Cynosure LLC v. Reveal Lasers LLC, No. 22-cv-11176-PBS, 2022 WL 18033055, at *11 (D. Mass. Nov. 9, 2022) (legitimate business interest in protecting confidential information where company "introduced evidence demonstrating that [the] senior executives ha[d] detailed knowledge [of its] business strategies and logistics"). By signing the Non-Solicitation Agreement, Onorato agreed that "the unique nature of the business of the Company and the nature of [his] services for the Company require the protections specified in this Agreement." D. 1-2 ¶ 4(c). Finally, the Non-Solicitation Agreement is reasonable in duration (temporal limit of twelve months beyond Onorato's employment at First Citizens) and scope (applicable only to a subset of customers, clients or prospects with whom Onorato had contact with during his employment or about whom

he learned confidential information during his employment). First Citizens has, therefore, shown a reasonable likelihood of success on the merits that the Non-Solicitation Agreement is valid and enforceable.

### 3. *Alleged Breach of Non-Solicitation Agreement (Count I)*

To succeed on a breach of contract claim, First Citizens must show (1) the existence of a valid contract, (2) that it has performed its obligations under the contract, and (3) a breach of the contract that causes damages. Persson v. Scotia Prince Cruises, Ltd., 330 F.3d 28, 34 (1st Cir. 2003). Having resolved the first issue as to validity, the parties' dispute centers on whether Onorato breached various provisions of the Non-Solicitation Agreement.

#### a) Confidential Information Claim

First Citizens contends that Onorato breached the Non-Solicitation Agreement by disclosing Confidential Information, including client names and contact information, to CIBC while he was employed at First Citizens. D. 3 at 11; see D. 1 ¶¶ 47-52. The Non-Solicitation Agreement defines Confidential Information means "any information, whether or not in writing, concerning the Company or its business or activities that the Company has not released to the general public." D. 1-2 ¶ 1. "Confidential Information" includes but is not limited to "customer and client lists and identities, potential customers and clients." Id.

In claiming that Onorato breached the Confidential Information provision, First Citizens alleges that "CIBC was directly involved in reaching out to the clients that Onorato had serviced," and that one First Citizens client received an email from Mullaney less than a week after Onorato announced his departure. D. 1 ¶ 47; see id. ¶¶ 48-49. There is insufficient evidence on the record, however, to conclude that Onorato provided Mullaney with the Confidential about First Citizens clients serviced by Onorato. First Citizens reached the conclusion that Onorato must have given

11

Mullaney the information leading to his outreach, but it fails to point to evidence to support that contention. Defendants deny Onorato's responsibility for Mullaney's and CIBC's outreach to Onorato's clients with whom Mullaney had also previously worked, D. 12 at 8-9, and attest in their declarations that Mullaney had knowledge and access to those clients' identities and contact information independent of Onorato. See D. 12-1 ¶ 10; D. 12-2 ¶ 11.

                              b)        Notice Period Obligations Claim

First Citizens also asserts that Onorato breached the Non-Solicitation Agreement by notifying clients of his departure from First Citizens and future employment at CIBC. D. 3 at 11; see D. 1 ¶¶ 47-52. The Non-Solicitation Agreement provides that during the Notice Period, Onorato "may not perform any services for any other employer," "shall not announce or disclose to any clients or customers of [First Citizens] [his] resignation, retirement, future employment relationship, or business plans and he shall not permit any subsequent employer or business associate to announce [his] resignation from [First Citizens] or [his] future employment relationship or business plans." D. 1 ¶¶ 36-37; D. 1-2 ¶ 3. The Notice Period was for ninety days after Onorato announced his departure on December 20, 2024, D. 1 ¶ 40, or March 20, 2025. Normally, "a financial advisor's simple 'announcement' to his or her former clients of a change in the advisor's place of employment is not, by itself, a 'solicitation.'" Fidelity Brokerage Servs., LLC v. Callinan, No. 1884-cv-02098BLS1, 2019 WL 1576097, at *6 (Mass. Super. Ct. Feb. 11, 2019). Here, however, the Notice Period Obligations included a restraint on disclosure of his future employment made by himself or by his future employer, CIBC. See D. 1-2 ¶¶ 3-4.

First Citizens asserts that "[t]he only way that clients could have known about Onorato's resignation and future employment with CIBC is because Onorato, despite his contractual obligations not to share his future employment with clients during the Notice Period, told them."

D. 1 ¶ 46. Even given the emails cited by First Citizens in its complaint, D. 1 ¶¶ 47-52, the present record does not reveal the source of the information about Onorato's transition, which could have employees of First Citizens other than Onorato. See D. 12 at 8. Further, Onorato maintains that during the notice period "First Citizens cut off [his] access to company email and other company resources," D. 12-1 ¶ 12, that he "did not reach out to [his] clients to let them know he had resigned and, if [his] clients reached out to [him], [he] told them that 'changed are coming' or words to that effect," id. ¶ 14. It remains contested whether Onorato himself announced or disclosed to clients his departure from First Citizens. See Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc., 759 F. Supp. 2d 110, 125 n.107 (D. Mass. 2010) (explaining that "when courts are faced with affidavits at odds and must make a credibility determination between them, courts generally do not issue a preliminary injunction, but rather leave the issue for a jury to resolve").

    c)  Solicitation Claim

First Citizens asserts that Onorato breached the Non-Solicitation Agreement by both directly and indirectly soliciting clients to transfer their accounts from First Citizens to CIBC. D. 3 at 11-12. First Citizens claims that Mullaney's email to clients serviced by Onorato within a week of his notice of resignation and the clients' seeming change of attitude towards Mullaney after copying Onorato to Mullaney's email "indicat[es] that Onorato had contacted the client and explained Onorato's plans to join CIBC." D. 1 ¶¶ 47-48. Additionally, First Citizen points to an email from a client in response to another First Citizens advisor's introductory email asking Onorato for advice on the best way to decline the invitation for support that Onorato "had solicited the client and was working to transfer the client's account to CIBC." Id. ¶ 49; see also id. ¶¶ 50-52. None of these communications, however, indicate that Onorato had contacted the clients affirmatively to solicit their business at CIBC. Onorato maintains that during the Notice Period,

13

he "did not work [during his garden leave period] unless First Citizens' employees had specific questions for him." D. 12-1 ¶ 13.  First Citizens also does not put forth any allegations suggesting that Onorato initiated contact with the clients.  See Grimes, 2024 WL 5110193, at *6.  With respect to Mullaney, he attests that he did not obtain any confidential information regarding First Citizens clients from Onorato and that he independently pursued them given his restrictive covenant had already elapsed.  D. 12-2 ¶¶ 10-13.  Again, First Citizens has not put forth sufficient evidence that Onorato was involved in directing Mullaney, or anyone from CIBC to solicit existing and prospective First Citizens clients.  See NuVasive, No. 19-cv-10800, 2019 WL 2287709, at *6 n.3 (D. Mass. May 29, 2019) (denying preliminary injunction as to the alleged breach of defendant's agreement not to solicit plaintiff's employees because of vague and conclusory allegations), aff'd, 954 F.3d 439 (1st Cir. 2020).

For the aforementioned reasons, First Citizens has not shown a likelihood of success on its breach of contract claim, Count I, against Onorato.

### 4. Breach of the Duty of Loyalty Claim (Count V) and Breach of Fiduciary Duty Claim (Count VI) and Aiding and Abetting Same (Count VII)

To establish a claim for breach of fiduciary duty or loyalty, Plaintiff must prove that (1) Mr. Onorato had a duty to Plaintiff; (2) Mr. Onorato breached that duty; (3) Plaintiff suffered damages; and (4) Mr. Onorato's breach caused Plaintiff's damages.  See Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153, 164 (1999).  "Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer." People's Choice Mortgage, Inc. v. Premium Capital Funding, LLC, No. 06–3958–BLS2, 2010 WL 1267373, at *12 (Mass. Super. Ct. Mar. 31, 2010) (quoting Chelsea Indus., Inc. v. Gaffney, 449 N.E.2d 320 (1983)).  First Citizens asserts that Onorato breached his duty of loyalty and fiduciary duty, while still employed at First Citizens (after his notice of departure), by allegedly soliciting

First Citizens clients to transfer their accounts to CIBC and providing Confidential Information to CIBC. D. 3 at 12-13. Even assuming that as Managing Director, Onorato occupied a position of trust and confidence at First Citizens, it has failed to show a breach of any duty for reasons similar to this Court's conclusion that it has failed to show a breach of the Non-Solicitation Agreement, where the breaches are premised on the same factual allegations. To prevail on a claim for aiding and abetting a breach of fiduciary duty against CIBC, the plaintiff must prove: (1) breach of a fiduciary duty by Onorato; (2) CIBC knew about the breach; and (3) it "actively participate[d] or substantially assist[ed] in or encourage[d] the breach to the degree that [it] could not reasonably be held to have acted in good faith." Arcidi v. National Ass'n of Gov't Employees, 447 Mass. 616, 623-24 (2006). Where First Citizens failed to demonstrate a likelihood of success on the merits on the breach of duty claims against Onorato, its claim of aiding and abetting same against CIBC likewise fails.

### 5. Tortious Interference Claims (Counts II and IV)

To prevail on its claims of tortious interference with a contract, a plaintiff must demonstrate that: (1) it had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) "the defendant's interference, in addition to being intentional, was improper in motive or means"; and (4) the plaintiff was harmed by the defendant's actions. Psy-Ed Corp. v. Klein, 459 Mass 697, 715 (2011). Here, contrary to First Citizens's argument, the emails referenced in the complaint, see D. 1 ¶¶ 44-59, do not "establish that Onorato and CIBC were reaching out to those clients to solicit them on behalf of Onorato while Onorato was still employed by First Citizens." D. 3 at 15. Even accepting First Citizens's proposition that CIBC "was put on notice of Onorato's contractual obligations, both by Onorato himself and by First Citizens," id.; D. 1 ¶¶ 53-56, the present record does not include facts indicating that the alleged

interference and solicitation by CIBC was the product of improper motive or means. See Cavicchi v. Koski, 67 Mass. App. Ct. 654, 657 (2006) (defining improper means to include "violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation" and defining improper motive to include "evidence of retaliation or ill will toward the plaintiff").

Accordingly, First Citizens has failed to meet its burden of demonstrating that it will likely succeed on the merits of their claims of tortious interference.

### 6. *Violation of the DTSA (Count III)*

The Defend Trade Secrets Act ("DTSA") provides a private right of action to "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To prevail on a trade secret misappropriation claim under the DTSA, a plaintiff must show that 1) the information at issue constitutes a trade secret (related to a product or service used in or intended to be used in interstate/foreign commerce); 2) the plaintiff took reasonable measures to secure the confidentiality of that information; and 3) the defendant obtained the trade secret through improper means. Builder Servs. Grp., Inc. v. Harkins, No. 23- cv-11375, 2023 WL 4685943, at *4 (D. Mass. July 21, 2023) (noting that the standard under the DTSA is substantially similar to the one for violation of the Massachusetts Uniform Trade Secrets Act); Washington Trust Advisors, Inc. v. Arnold, 646 F. Supp. 3d 210, 217 (D. Mass. 2022). The parties' dispute regarding this claim primarily hinges on whether the client lists at issue here are trade secrets and whether Defendants obtained them through improper means.

For the moment, the Court will assume *arguendo*, without deciding, that the clients lists are trade secrets and will focus on the parties' dispute about whether such alleged trade secrets were obtained through improper means.

Certainly, a former employee who breaches his contractual obligations to obtain trade secrets has, as a matter of law, used improper means. See, e.g., DraftKings Inc., 732 F. Supp. 3d at 119; Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 240 (D. Mass. 2011); SpeeDee Worldwide, LLC v. Toppa, No. 24-cv-10274, 729 F. Supp. 3d 125, 131 (D. Mass. Apr. 10, 2024). Here, however, the present record does not support First Citizens's allegations that Onorato misappropriated its client lists, as discussed above, and Onorato attests that he "did not take First Citizens's confidential information or trade secrets with [him]." D. 12-1 ¶ 15; cf. Bos. Centerless, Inc. v. DeSantis, No. 1:22-cv-11729-RGS, 2022 WL 16639138, at *1 (D. Mass. Nov. 2, 2022) (concluding that there had been a showing of likelihood of success on the merits of a trade secret misappropriation claim where "Defendant, on his last day of employment with the Company and without the Company's permission, emailed to his personal email accounts multiple spreadsheets containing Plaintiff's trade secrets and confidential information, including Plaintiff's proprietary and competitively sensitive customer information"). Mullaney also attests in his declaration that "Onorato did not tell [him] the names of [Onorato's] clients" and that he had such information from his time working with the clients while employed by First Citizens. D. 12-2 ¶ 13. Having determined that there has not been a showing on the record that Onorato breached his contractual obligations as to Confidential Information (which includes but is not limited to trade secrets) and similarly that First Citizens has not shown misappropriation of trade secrets, First Citizens has not shown it is likely to succeed on the merits of its DTSA claim.

For all of the aforementioned reasons, First Citizens has not shown a reasonable likelihood of success on its claims.[1]

---

[1] Although First Citizens also asserted claims for unjust enrichment and unfair competition (Counts VIII and IX, respectively), it did not focus on these claims in its motion papers seeking injunctive relief and, therefore, the Court does not address them here. See D. 3 at 9-18.

17

B.     **Irreparable Harm**

Even if it had shown a reasonable likelihood of success on any of its claims, First Citizens has not shown a "significant risk of irreparable harm if the injunction is withheld," Equal Emp. Opportunity Comm'n v. Astra USA, Inc., 94 F.3d 738, 742 (1st Cir. 1996), that "cannot adequately be remedied through money damages alone." Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 242 (D. Mass. 2013), aff'd, 731 F.3d 6 (1st Cir. 2013). As the First Circuit has explained, "[t]he necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies. The two are flip sides of the same coin: if money damages will fully alleviate harm, then the harm cannot be said to be irreparable." K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989). If First Citizens loses clients and accounts due to Defendants' use of confidential information, trade secrets or solicitation, the profits lost related to the clients should be quantifiable. See Rohm, 759 F. Supp. 2d at 127 (explaining that "a loss of customers (or customer goodwill) do[es] not necessarily constitute irreparable injury"); Bear, Stearns & Co. v. Sharon, 550 F. Supp. 2d 174, 178 (D. Mass. 2008) (noting that "the financial services industry is uniquely skilled at computing the economic value of a given client"). The absence of irreparable harm is particularly clear from First Citizens's vague allegations regarding its harm and lack of any evidence to bolster its claims that any alleged, wrongful access and use of Confidential Information has resulted in loss of clients or goodwill. Accordingly, Plaintiffs have not established the required element of irreparable harm.[2]

---

[2] First Citizens moved for leave for expedited discovery pertaining to its motion for preliminary injunction. D. 4. Having considered the motion, D. 4-5, and Defendants' opposition to same, D. 13, and the factors under Momenta Pharms., Inc. v. Teva Pharms. Indus. Ltd., 765 F. Supp. 2d 87, 88-89 (D. Mass. 2011) (considering, in addition to "good cause for expedited discovery," the "purpose for the discovery, the ability of the discovery to preclude demonstrated irreparable harm, the plaintiff's likelihood of success on the merits, the burden of discovery on the defendant, and the degree of prematurity") (internal citation omitted), the Court concludes that

Having determined that Plaintiffs has not demonstrated a likelihood of success on their claims or a likelihood of irreparable harm absent an injunction, the Court need not reach the factors of balancing the equities between the parties, and the public interest. See Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005).

## VI. Conclusion

For the foregoing reasons, the Court DENIES First Citizens's motion for injunctive relief, D. 2, and DENIES First Citizens's motion for limited expedited discovery, D. 4.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

such expedited discovery is not warranted here. Accordingly, the Court denies First Citizens's motion, D. 4.