**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **FIRST-CITIZENS BANK & TRUST COMPANY,** | ) ) ) ) |
| **Plaintiff** | ) ) ) |
| **v.** | ) Case No. 25-cv-11331-DJC ) |
| **MICHAEL ONORATO and CIBC PRIVATE WEALTH ADVISORS, INC.,** | ) ) ) ) |
| **Defendants.** | ) ) ) ) |

**MEMORANDUM AND ORDER**

**CASPER, C. J.**                                                    **March 23, 2026**

## I.    Introduction

Plaintiff First-Citizens Bank & Trust Company ("First Citizens") has filed this lawsuit against Michael Onorato ("Onorato") and CIBC Private Wealth Advisors, Inc. ("CIBC") (collectively, "Defendants") alleging breach of contract (Count I), breach of duty of loyalty (Count V) and breach of fiduciary duty (Count VI) claims against Onorato; tortious interference with existing contractual relationships (Count II) and aiding and abetting breach of fiduciary duty and duty of loyalty (Count VII) claims against CIBC; and violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.* (Count III), tortious interference with contractual relationships and prospective economic advantage (Count IV), unjust enrichment (Count VIII) and unfair competition (Count IX) claims against Defendants based on Defendants' alleged solicitation of First Citizens clients and misappropriation of trade secrets to CIBC in violation of Onorato's Non-Solicitation Agreement with First Citizens.  D. 1.  Defendants now move to dismiss under Fed. R.

1

Civ. P. 12(b)(6).  D. 27.  For the reasons discussed below, the Court ALLOWS the motion as to

Counts I and IV in part, and as to Counts II, III, VII, VIII and IX in whole, and DENIES the motion

as to Counts I and IV in part, and as to Counts V and VI in whole.  Id.

## II.    Standard of Review

In its prior ruling on the preliminary injunction motion, the Court reviewed several of First

Citizens' claims under a likelihood of success on the merits standard, which "is higher than the

plausibility standard for a claim to survive a Rule 12(b)(6) motion to dismiss."  Hasan v. Educ.

Comm'n for Foreign Med. Graduates, No. 24-cv-10438-DJC, 2024 WL 5008882, at *3 (D. Mass.

Dec. 6, 2024) (citing Ayoub v. CitiMortgage, Inc., No. 15-cv-13218-ADB, 2018 WL 1318919, at

*8 (D. Mass. Mar. 14, 2018)).[1]  At the present motion to dismiss stage, "a court [may not] attempt

to forecast a plaintiff's likelihood of success on the merits."  Ocasio-Hernandez v. Fortuno-Burset,

640 F.3d 1, 13 (1st Cir. 2011).  Instead, "[t]he relevant inquiry focuses on the reasonableness of

the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the

complaint."  Id.

Under Rule 12(b)(6), a defendant may move to dismiss an action arguing that it fails to

state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The Court must determine

if the facts alleged "plausibly narrate a claim for relief."  Schatz v. Republican State Leadership

Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  To decide a Rule 12(b)(6) motion to

dismiss, the Court must, reading the complaint "as a whole," conduct a two-step, context-specific

inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must

perform a close reading of the claim to distinguish the factual allegations from the conclusory legal

---

[1] As First Citizens' preliminary injunction motion did not focus on its claims for unjust enrichment and unfair competition, Counts VIII and IX, the Court did not consider those claims at the preliminary injunction stage.  See D. 3 at 9-18; D. 30 at 17 n.1.

allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory legal allegations are not entitled credit.  Id.  Second, the Court must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief."  Schatz, 669 F.3d at 55.  If they do not, then dismissal is warranted.  See Ocasio-Hernandez, 640 F.3d at 12.

## III.    Factual Background

For the purposes of the motion to dismiss, D. 27, the Court confines itself to and accepts as true all well-pleaded facts in the complaint, save for considering "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice."  Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011).

First Citizens provides private banking, lending, brokerage and wealth management and investment advisory services to its clients.  D. 1 ¶¶ 1, 14.  Onorato began his employment at First Citizens' predecessor as a Senior Wealth Advisor in 2015, id. ¶ 23, and was later promoted to Managing Director, id.  ¶ 28.  When Onorato became a Managing Director at First Citizens, he had the responsibility of managing assigned clients' accounts and was allowed to access, use and develop First Citizens' proprietary and confidential information.  Id. ¶¶ 29-30.  In conjunction with and in consideration of Onorato's employment with a predecessor of First Citizens, on February 26, 2015, Onorato executed a Non-Solicitation & Confidentiality Agreement.  Id. ¶ 32; D. 1-1.  On May 2, 2021, in exchange for the right to participate in a lucrative incentive compensation plan, Onorato signed a Non-Solicitation and Confidentiality Agreement ("Non-Solicitation Agreement").  D. 1 ¶ 33; D. 1-2.  Under the terms of the Non-Solicitation Agreement, Onorato agreed that, both during his employment at First Citizens and all times thereafter, he would "keep secret and retain in strictest confidence, and [would] not disclose or use, other than in the

performance of [his] responsibilities for [First Citizens], any Confidential Information." D. 1 ¶ 34. Under the Non-Solicitation Agreement, Onorato further agreed that, in the event that he chose to resign or retire from First Citizens, he would provide First Citizens with ninety (90) days written notice of his intent to do so (the "Notice Period"). Id. ¶ 36. The Non-Solicitation Agreement also required that Onorato, both during his employment and for a period of one year thereafter, shall not directly or indirectly solicit customers, clients or prospects of First Citizens to do business with any person or entity that is competitive with First Citizens or induce or advise any customer, client or prospect to withdraw, curtail or diminish its business with First Citizens. Id. ¶ 38.

On December 20, 2024, Onorato accepted a position at CIBC and gave his 90-day notice to First Citizens, but did not inform First Citizens of his future plans. Id. ¶ 40. CIBC is a financial planning and investment advisory company that is competitive with First Citizens as it handles private wealth management. Id. ¶ 45. Up until his resignation, Onorato worked out of First Citizens' Boston office, id. ¶ 31, and First Citizens continued to pay Onorato, in accordance with the Non-Solicitation Agreement, id. ¶ 43.

As First Citizens wealth advisors assigned to take over the accounts serviced by Onorato began to contact clients, they heard from many clients that Onorato was leaving to go to CIBC. Id. ¶ 44. On December 23, 2024, less than a week after Onorato informed First Citizens of his plan to resign, one First Citizens client received an unsolicited email from a CIBC Senior Relationship Manager, Richard Mullaney ("Mullaney"), who previously worked with Onorato at a First Citizens predecessor. Id. ¶ 47. Mullaney noted his "shared history" with the client and provided information about CIBC. Id. The client immediately emailed Onorato at his First Citizens email address and asked for an explanation. Id. Later that same day, the client responded, copying Onorato, and advised Mullaney that he was free to call or text him after the start of the

4

New Year. Id. ¶ 48. On December 30, 2024, a new First Citizens advisor emailed the same client to introduce himself, and the client wrote to Onorato asking, "[a]dvice on best way to decline? And to be fiscally prudent and professionally correct? And, presumably, to move assets seamlessly?" Id. ¶ 49. On December 26, 2024, another First Citizens client wrote to Onorato at his First Citizens email address and declared: "I am sure you had a wonderful Christmas and will have a great New Year. After [] all, you have made a bi[g] decision – and glad it's behind you. So you're OUT but we are still IN. How do we get anything done? Who do we talk to?" Id. ¶ 50. On January 3, 2025, a First Citizens client who had recently asked for a copy of his statements forwarded them to Mullaney at CIBC via email, with a copy to Onorato's First Citizens email account, noting: "Hope this is what you need." Id. ¶ 51. On January 8, 2025, another First Citizens client, after requesting a copy of her account statements, informed First Citizens that she and her husband "have decided to transfer our account to CIBC and continue with Mike Onorato when he starts with that firm." Id. ¶ 52.

On January 28, 2025, First Citizens wrote to Onorato to "(1) remind him of his contractual legal obligations both during and after the Notice Period, (2) identify breach of those obligations that had occurred, and (3) demand that Onorato cease his misconduct and confirm his intent to comply with those obligations going forward." Id. ¶ 53; D. 1-3. On January 30, 2025, Onorato responded to confirm that he would comply with his obligations and that CIBC also understood his obligations during the Notice Period. D. 1 ¶ 54; D. 1-4. First Citizens wrote to Onorato again and CIBC on March 4, 2025 in another attempt to stop what it characterizes as the "continuing harm" of solicitations by Onorato. D. 1 ¶¶ 55-56; D. 1-5. Onorato's employment with First Citizens ended on March 19, 2025. D. 1 ¶ 58.

**IV.    Procedural History**

First Citizens commenced this action against Defendants on May 12, 2025.  D. 1.  On the same day, First Citizens moved for injunctive relief, D. 2, and subsequently moved for leave to conduct limited expedited discovery, D. 4.  The Court denied both motions on August 1, 2025.  D. 30.  The Court now considers Defendants' motion to dismiss.  D. 27.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 34.

**V.    Discussion**

**A.    Count I:  Breach of Contract Claim**

In Count I, First Citizens alleges that Onorato breached the Non-Solicitation Agreement by "sharing the confidential names and contact information of First Citizens clients that he serviced with CIBC, announcing his resignation and future employment at CIBC to First Citizens clients during the Notice Period, and soliciting First Citizens clients on behalf of CIBC, directly and indirectly, both during and after the Notice Period."  D. 1 ¶ 64.  Defendants move to dismiss on the grounds that the Non-Solicitation Agreement is neither valid nor enforceable and, even if it were, First Citizens has failed to allege a breach.  D. 28 at 9-14.

*1.    Choice of Law Provision*

The Non-Solicitation Agreement includes a provision that provides "[t]his Agreement shall be construed in accordance with and governed by the substantive laws of the Commonwealth of Massachusetts without regard to conflict of law provisions."  D. 1-2 ¶ 13.  As the Court explained fully in its preliminary injunction ruling, D. 30 at 6-9, and incorporates here, the choice of law provision is enforceable.  Id. (concluding that Massachusetts has a substantial relationship to the contract and the parties and that California does not have "a materially greater interest" than Massachusetts in this litigation); see Morris v. Watsco, Inc., 385 Mass. 672, 674 (1982) (noting

that Massachusetts courts will typically give effect to a contractual choice-of-law clause). Accordingly, the Court will apply Massachusetts law in considering First Citizens' breach of contract claim. To succeed on a breach of contract claim under Massachusetts law, First Citizens must show (1) the existence of a valid contract, (2) that it has performed its obligations under the contract and (3) a breach of the contract that causes damages. Persson v. Scotia Prince Cruises, Ltd., 330 F.3d 28, 34 (1st Cir. 2003).

### 2. *Validity and Enforceability of Non-Solicitation Agreement*

As to the first element, Defendants raise three challenges to the Non-Solicitation Agreement's validity and enforceability, arguing that the agreement: (1) is void under California law; (2) was not signed between Onorato and First Citizens; and (3) is void after a change of control. D. 28 at 9-14. As to Defendants' first argument, as previously explained, D. 30 at 6-9, Massachusetts law, not California law, governs the Non-Solicitation Agreement. Under Massachusetts law, a restrictive covenant such as non-solicitation agreement "is only reasonable, and thus enforceable, if it is (1) necessary to protect a legitimate business interest, (2) reasonably limited in time and space, and (3) consonant with the public interest." Automile Holdings, LLC v. McGovern, 483 Mass. 797, 808 (2020); Oxford Global Resources, LLC v. Hernandez, 480 Mass. 462, 471 (2018) (observing that the "same principles" apply to both noncompetition and non-solicitation provisions). As the Court previously explained, D. 30 at 9-11, the Non-Solicitation Agreement is an enforceable restrictive covenant under Massachusetts law. Id. Thus, Defendants' first argument fails.

Defendants' second argument is likewise unavailing. Defendants argue that even under Massachusetts law, First Citizens cannot enforce the Non-Solicitation Agreement because First Citizens and Onorato never signed a new agreement after First Citizens purchased Onorato's

contract from Silicon Valley Bank ("SVB"), making the non-solicitation provision unenforceable under Massachusetts's material change doctrine.  D. 28 at 11-12; see D. 1 ¶¶ 23-27, 33.  Under the Massachusetts material change doctrine, "a 'non-solicitation agreement or covenant not to compete may be deemed void if there are material changes in the employment relationship between an employee and the employer.'"  NuVasive, Inc. v. Day, 954 F.3d 439, 444 (1st Cir. 2020) (quoting Patriot Energy Grp., Inc. v. Kiley, No. SUCV2013-04177-BLS1, 2014 WL 880880, at *7 (Mass. Super. Ct. Feb. 26, 2014)).  The key issue in this regard is "whether the employment agreement had been 'mutually abandoned and rescinded,'" which depends upon the intention of the parties.  Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 16 (1st Cir. 2009) (quoting Intertek Testing Servs. NA, Inc. v. Curtis-Strauss LLC, No. 98903F, 2000 WL 1473126, at *6 (Mass. Super. Ct. Aug. 8, 2000)).  "The most common changes that may void restrictive covenants under the material change doctrine include pay cuts, demotions, or breaches of the employment contract."  Wash. Tr. Advisors, Inc. v. Arnold, 646 F. Supp. 3d 210, 219 (D. Mass. 2022) (citing Nuvasive, Inc., 954 F.3d at 444).

Onorato began his employment at First Citizens' predecessor, BP Wealth Management, LLC, a subsidiary of Boston Private Financial Holdings, Inc. ("Boston Private") in 2015, which was later acquired by SVB on January 4, 2021.  D. 1 ¶¶ 23-24.  Onorato executed the Non-Solicitation Agreement at issue on May 2, 2021, following SVB's acquisition of Boston Private.  Id. ¶ 33; see D. 1-2.[2]  On March 10, 2023, the California Department of Financial Protection and Innovation closed SVB and appointed the Federal Deposit Insurance Corporation ("FDIC") as

---

[2] The Non-Solicitation Agreement defines the Company to which Onorato is bound as "Boston Private Financial Holdings, Inc. ("BPFH") and any and all of its wholly or partially owned subsidiaries and other affiliates."  D. 1-2 at 2.  Defendants do not appear to dispute that this definition covers SVB, see D. 28 at 10-11, thus the Court assumes, without deciding, that the Non-Solicitation Agreement covers SVB.

Receiver, which placed SVB's assets into a bridge bank. D. 1 ¶¶ 25-26. First Citizens subsequently purchased and assumed SVB's assets from FDIC, including Onorato's contract, on March 27, 2023. Id. ¶ 27.[3] Defendants contend that the change in Onorato's employer from SVB to First Citizens constituted a material change in employment that renders the Non-Solicitation Agreement unenforceable by First Citizens absent the execution of a new agreement between First Citizens and Onorato pursuant to the material change doctrine. D. 28 at 11-12. Defendants do not, however, point to any case that applied the material change doctrine on the sole basis of a change in employers where an employee's position otherwise remained the same, see id., nor has the Court identified such a case. Moreover, there is no indication that the parties mutually abandoned and rescinded the Non-Solicitation Agreement due to First Citizens' purchase of SVB's assets. On the contrary, Onorato gave First Citizens notice of his intent to resign in compliance with the Non-Solicitation Agreement, after which First Citizens reminded him of his obligations pursuant to the agreement to which Onorato confirmed he would comply, and First Citizens paid Onorato for the duration of the Notice Period as contractually required. D. 1 ¶¶ 40-43; see Astro-Med, 591 F.3d at 16-17 (concluding that this doctrine did not apply where the employee's job change did "not reflect a mutual abandonment and rescission of the non-competition provision," there was no suggestion that the employer approached the employee with a new employment agreement, and there was no evidence of intent on the part of either party to revoke or superseded

---

[3] Contrary to Defendants' contention, D. 28 at 11 n.3, First Citizens has plausibly alleged that Onorato's Non-Solicitation Agreement was properly assigned from SVB to FDIC's bridge bank and then to First Citizens. The Non-Solicitation Agreement provides that "this Agreement shall survive any sale of assets, merger, consolidation, or other change in corporate structure." D. 1-2 ¶ 11. Further, First Citizens alleges that it "acquired and assumed certain of the bridge bank's agreements, including those entered into by Onorato" when it entered into the Purchase and Assumption Agreement with FDIC. D. 1 ¶ 27. Thus, it is plausibly alleged that the Non-Solicitation Agreement survived SVB's closure, its transfer from FDIC to FDIC's bridge bank and its sale to First Citizens. See id. ¶¶ 25-27.

the employment agreement).     Further, as First Citizens notes, D. 31 at 16-17, even "[a]ssuming, arguendo, that the enforceability of the non-compete provision hinges on whether there was a material change in [defendant's] employment terms, significant fact issues remain that cannot be decided at this stage" and thus this question is not properly resolved at the motion to dismiss stage.  Agero Admin. Serv. Corp. v. Campolo, 366 F. Supp. 3d 170, 174 (D. Mass. 2019).

Defendants' third argument also fails.  Defendants argue that because there was a "Change of Control" from SVB to First Citizens after the Non-Solicitation Agreement was signed, the agreement is void under Section 11 of its terms.  D. 28 at 12-13.  Section 11 of the Non-Solicitation Agreement states in relevant parts:

> [I]f my employment terminates without Cause upon or following a Change of Control or a Sale Event, my obligations under Section 4 ("Non-Solicitation") shall no longer be in effect.  For purposes of this Agreement, (i) a termination without "Cause" shall have the same meaning as a Job Elimination, as that term is defined in the BPFH Severance Pay Plan as in effect on the date of this Agreement (the "Plan"); and (ii) the terms "Change of Control" and "Sale Event" shall have the same meanings as set forth in the Plan.

D. 1-2 ¶ 11.  The viability of Defendants' argument rests on the meaning of terms defined in "the BPFH Severance Pay Plan," id., which is neither referenced in nor attached to the complaint or motion papers, see Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993), therefore, is not viable at this stage.

For the aforementioned reasons, the Court concludes that First Citizens has plausibly alleged that the Non-Solicitation Agreement is valid and enforceable.  Additionally, First Citizens has plausibly alleged that it performed its obligations under same by continuing to pay Onorato during the Notice Period.  D. 1 ¶ 43; D. 1-2 ¶ 3.  Thus, the Court considers whether First Citizens plausibly alleged that Onorato breached various provisions of the Non-Solicitation Agreement.

10

### 3.   *Breach of the Non-Solicitation Agreement Claims*

#### a)   Confidential Information Claim

First Citizens first alleges that Onorato breached the Confidential Information provision by "sharing the confidential names and contact information of First Citizens clients that he serviced with CIBC." Id. ¶ 64.  The Non-Solicitation Agreement defines Confidential Information to mean, among other things, "any information, whether or not in writing, concerning the Company or its business or activities that the Company has not released to the general public."  D. 1-2 ¶ 1. "Confidential Information" includes but is not limited to "customer and client lists and identities, potential customers and clients." Id.  Defendants move to dismiss on the ground that First Citizens has failed to allege Onorato shared the client list with CIBC.  D. 28 at 13-14.  First Citizens alleges that Onorato breached the Confidential Information provision based on Mullaney's email exchange with a First Citizens client, with whom Mullaney had a "shared history," and another First Citizens client's email to Mullaney.  D. 1 ¶¶ 47-48; 51; see D. 31 at 18.  First Citizens fails, however, to allege that Onorato provided Mullaney or CIBC with any Confidential Information about these clients.  Thus, First Citizens has failed to plausibly allege that Onorato breached the Confidential Information provision.

#### b)   Notice Period Obligations Claim

First Citizens next alleges that Onorato breached the Notice Period Obligations provision by sharing the client list with CIBC and "announcing his resignation and future employment at CIBC to First Citizens clients during the Notice Period."  D. 1 ¶ 64.  The Non-Solicitation Agreement provides that during the Notice Period, Onorato "may not perform any services for any other employer," "shall not announce or disclose to any clients or customers of [First Citizens] [his] resignation, retirement, future employment relationship, or business plans and he shall not

11

permit any subsequent employer or business associate to announce [his] resignation from [First Citizens] or [his] future employment relationship or business plans." D. 1-2 ¶ 3. The Notice Period was for ninety days after Onorato announced his departure on December 20, 2024, D. 1 ¶ 40, or March 20, 2025. Defendants move to dismiss on the ground that First Citizens has failed to allege that Onorato announced his resignation. D. 28 at 13.

For the reasons stated above, First Citizens has not plausibly alleged that Onorato breached this provision by sharing the client list with CIBC. Nor is First Citizens' conclusory allegation that "[t]he only way that clients could have known about Onorato's resignation and future employment with CIBC is because Onorato . . . told them," D. 1 ¶ 46, afforded any weight to support its claim, see Schatz, 669 F.3d at 55. First Citizens has, however, plausibly alleged that Onorato breached this provision based on the emails from First Citizens clients during the Notice Period. See D. 1 ¶¶ 47-52. As alleged, these emails show that certain of First Citizens' clients knew about Onorato's future employment at CIBC during the Notice Period, id. ¶ 52, and, when read in the light most favorable to First Citizens, that some clients at least learned that Onorato was resigning from First Citizens during the Notice Period, see id. ¶¶ 49-51. As several of these emails were directed at or included Onorato, see id. ¶¶ 48-51, including those that also included his future CIBC colleague, Mullaney, see id. ¶¶ 48, 51, it is reasonable to infer from First Citizens' allegations that this information was shared either directly by Onorato or indirectly by Mullaney during the Notice Period. See Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). Accordingly, First Citizens has plausibly alleged this claim.

c)      Solicitation Claim

First Citizens also alleges that Onorato breached the Non-Solicitation provision by "soliciting First Citizens clients on behalf of CIBC, directly and indirectly, both during and after

the Notice Period." D. 1 ¶ 64. The Non-Solicitation provision prohibits Onorato from "directly or indirectly" soliciting any First Citizens customer, client or prospective client to do business with a First Citizens competitor either during his employment with First Citizens or in the one year period following his termination of employment (the "Restricted Period"). D. 1-2 ¶ 4(a)(ii)-(iii). The provision defines solicitation to include "advis[ing] others of the identity of a potential . . . customer or client" and "advis[ing] others concerning the process of encouraging a person or entity to . . . become a customer or client of another person or entity." Id. ¶ 4(b)(ii). Defendants move to dismiss on the ground that First Citizens has failed to allege that Onorato either directly or indirectly solicited First Citizen clients during the Restricted Period. D. 28 at 13-14.

First Citizens has plausibly alleged that Onorato at least indirectly solicited First Citizens clients to do business with CIBC, a competitor of First Citizens, through Mullaney's email to a First Citizens client serviced by Onorato within a week of his notice of resignation. See D. 1 ¶¶ 45, 47-48. Additional emails from First Citizens clients communicating that they "have decided to transfer [their] account to CIBC and continue with Mike Onorato when he starts with that firm," id. ¶ 52, and including Onorato on communications suggesting that they are transferring their accounts to CIBC, id. ¶¶ 50-51, also lend themselves to a reasonable inference that Onorato either directly or indirectly solicited them to work with CIBC. Even if, *arguendo*, without deciding, these clients initiated these conversations with Onorato and Mullaney, "it may [still] be solicitation for [Onorato] to . . . otherwise encourage the client[s] to bring [their] business there." Getman v. USI Holdings Corp., No. 05-cv-3286-BLS2, 2005 WL 2183159, at *4 (Mass. Super. Sept. 1, 2005). Further, First Citizens has plausibly alleged that Onorato's and Mullaney's alleged announcement of Onorato's resignation from First Citizens and future employment at CIBC to First Citizens clients, although "not, by itself, a 'solicitation,'" Grimes & Co., Inc. v. Carlson, No.

13

24-cv-11521-MRG, 2024 WL 5110193, at *6 (D. Mass. Dec. 12, 2024) (citing Fid. Brokerage Servs., LLC v. Callinan, No. 1884-cv-02098-BLS1, 2019 WL 1576097, at *6 (Mass. Super. Feb. 11, 2019) (internal quotation and quotation marks omitted)), might have "crossed the line into solicitation" by being "'effectively solicitations wrapped in the thin veneer of an announcement," id. (citing Fid. Brokerage Servs., LLC, 2019 WL 1576097, at *7), particularly as here, the Notice Period Obligations included a restraint on disclosure of Onorato's future employment with CIBC. See D. 1-2 ¶¶ 3-4.  Accordingly, First Citizens has plausibly alleged that Onorato breached the Non-Solicitation provision.

For the aforementioned reasons, Defendants' motion to dismiss Count I is allowed in part as to the Confidential Information claim, and denied in part as to the Notice Period Obligations and Solicitation claims.

## A.    Count III:  Violation of the DTSA

In Count III, First Citizens alleges that Defendants misappropriated First Citizens' trade secrets, including Onorato's First Citizens client list, in violation of DTSA.  D. 1 ¶¶ 74-89.  DTSA provides a private right of action to "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  To prevail on a trade secret misappropriation claim under the DTSA, a plaintiff must show that:  (1) the information at issue constitutes a trade secret (related to a product or service used in or intended to be used in interstate/foreign commerce); (2) the plaintiff took reasonable measures to secure the confidentiality of that information; and (3) the defendant obtained the trade secret through improper means.  Builder Servs. Grp., Inc. v. Harkins, No. 23-cv-11375, 2023 WL 4685943, at *4 (D. Mass. July 21, 2023) (noting that the standard

14

under the DTSA is substantially similar to the one for violation of the Massachusetts Uniform Trade Secrets Act); see Wash. Tr. Advisors, Inc., 646 F. Supp. 3d at 217.

As it was at the preliminary injunction stage, the parties' dispute regarding this claim primarily hinges on whether the client lists at issue here are trade secrets and whether Defendants obtained them through improper means. D. 28 at 16-18; D. 31 at 19-21. Even assuming, *arguendo*, without deciding, that the client lists are trade secrets under DTSA, First Citizens does not plausibly allege that Onorato obtained the list through improper means. Cf. BioPoint, Inc. v. Attis, No. 20-cv-10118-RGS, 2020 WL 1446725, at *2 (D. Mass. Mar. 25, 2020) (concluding that complaint sufficiently alleged that trade secret misappropriation was achieved by improper means where "the unfair advantage [Defendant's company] derived [was] from [co-Defendant]'s espionage and the insight it provided into [Plaintiff]'s prospective client and consultant leads"); Bos. Centerless, Inc. v. DeSantis, No. 22-cv-11729-RGS, 2022 WL 16639138, at *1 (D. Mass. Nov. 2, 2022) (concluding that there had been a showing of likelihood of success on the merits of a trade secret misappropriation claim where "Defendant, on his last day of employment with the Company and without the Company's permission, emailed to his personal email accounts multiple spreadsheets containing Plaintiff's trade secrets and confidential information, including Plaintiff's proprietary and competitively sensitive customer information"). Although a former employee who breaches his contractual obligations to obtain trade secrets has, as a matter of law, used improper means, see, e.g., DraftKings Inc. v. Hermalyn, 732 F. Supp. 3d 84, 119 (D. Mass. 2024); Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 240 (D. Mass. 2011); SpeeDee Worldwide, LLC v. Toppa, 729 F. Supp. 3d 125, 131 (D. Mass. Apr. 10, 2024), as alleged here, Onorato was given access to the client lists by First Citizens to perform his duties as a Managing Director, a position he continued to occupy during the Notice Period, see D. 1 ¶¶ 29-30, and First Citizens has

15

not plausibly alleged that he obtained such information through improper means as is required for a DTSA claim. Accordingly, First Citizens has failed to plausibly allege its DTSA claim. Count III is dismissed.[4]

### B.    Counts II and IV:  Tortious Interference Claims

In Counts II and IV, First Citizens alleges CIBC interfered with First Citizens' contractual relationship with Onorato by "inducing, aiding and abetting, and encouraging him to violate his contractual covenants and restrictions with First Citizens," D. 1 ¶ 69, and that Defendants interfered with First Citizens' contracts and relationships with its clients by attempting to induce them to sever their contracts with First Citizens in favor of CIBC, id. ¶ 93. To prevail on its claims of tortious interference with a contract, First Citizens must demonstrate that:  (1) it had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) "the defendant's interference, in addition to being intentional, was improper in motive or means"; and (4) the plaintiff was harmed by the defendant's actions. Psy-Ed Corp. v. Klein, 459 Mass 697, 715 (2011). Defendants move to dismiss on the ground that First Citizens has failed to allege any intentional or improper interference on behalf of CIBC or Onorato. D. 28 at 14-16.[5]

---

[4] While First Citizens primarily alleges subject matter jurisdiction for this suit based on federal question jurisdiction for its DTSA claim and supplemental jurisdiction for its remaining claims, D. 1 ¶¶ 10-11; D. 1-6 at 2; see 28 U.S.C. § 1331; 28 U.S.C. § 1367, it has also alleged subject matter jurisdiction based on diversity jurisdiction, D. 1 ¶ 12; see 28 U.S.C. § 1332. Thus, the dismissal of the DTSA claim does not divest this Court of jurisdiction over the remaining claims.

[5] To the extent Defendants suggest that the heightened "actual malice" standard applies here, see D. 28 at 15, the Court concludes that it does not. Where a corporate official is accused of tortiously interfering with "contractual or prospective contractual relations between the corporation and its employees," a heightened "actual malice" standard applies requiring the plaintiff to demonstrate that the alleged interference was motivated by "a spiteful, malignant purpose unrelated to a legitimate corporate interest." See Blackstone v. Cashman, 448 Mass. 255, 260-62, 270 (2007). As the tortious interference claims here are not asserted by a First Citizens employee against a First Citizens official, the "actual malice" standard is inapplicable. See id. at 265 (affirming that "the actual malice standard [is] the correct standard to apply when an unlawful interference claim is asserted by an employee against an official of the employer").

As to First Citizens' claim that CIBC interfered with its contractual relationship with Onorato (Count II), as explained above, First Citizens has plausibly alleged that it had a contract with Onorato. The complaint, however, is devoid of facts alleging that CIBC knowingly encouraged Onorato to violate the Non-Solicitation Agreement. Thus, this claim fails. Accordingly, Count II is dismissed.

As to First Citizens' claim that Defendants interfered with its contractual relationships with its clients (Count IV), First Citizens has plausibly alleged contractual relationships with its clients. See D. 1 ¶¶ 47-52. First Citizens has also plausibly alleged that Defendants induced its clients to break said contracts by soliciting them to leave First Citizens. As to CIBC, First Citizens' solicitation allegations primarily revolve around Mullaney's conduct, see id. ¶¶ 47-48, 51, and thus presumably rely upon a theory of vicarious liability, see Dias v. Brigham Med. Assocs., Inc., 438 Mass. 317, 319-20 (2002). "To prevail on a claim of vicarious liability, a plaintiff must demonstrate both that (1) an employer-employee relationship existed and (2) the alleged tortious conduct fell within the scope of employment." Dyer v. Steward Carney Hospital, Inc., No. 17-cv-11452, 2021 WL 4554083, at *5 (D. Mass. Oct. 5, 2021 (citing Dias, 438 Mass. at 321-22). Here, First Citizens has plausibly alleged that Mullaney is a CIBC employee and that his conduct in corresponding with First Citizens' clients fell within the scope of his employment as a Senior Relationship Manager. See D. 1 ¶¶ 47-48, 51. As First Citizens has alleged that Mullaney sent an unsolicited email to a First Citizens client to provide him with information about CIBC, id. ¶ 47, and that First Citizens clients left First Citizens in response to Mullaney's outreaches, see id. ¶¶ 48, 51, the second element is alleged as to CIBC. This element is likewise alleged as to Onorato, as explained above.

As to the third element, First Citizens offers no alleged facts to support the contention that CIBC's solicitations were improper in motive or means.  See Cavicchi v. Koski, 67 Mass. App. Ct. 654, 657 (2006) (defining improper means to include "violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation" and defining improper motive to include "evidence of retaliation or ill will toward the plaintiff"); see also Primarque Prods. Co. v. Williams W. & Witt's Prods. Co., No. 15-cv-30067-TSH, 2015 WL 10097150, at *1 (D. Mass. Nov. 18, 2015) (concluding that plaintiff plausibly alleged actual malice where defendant solicited clients after sending "spiteful emails" threatening to undermine plaintiff by soliciting business from them).  Instead, the complaint suggests that Mullaney and CIBC had an interest in gaining new clients, see D. 1 ¶ 47; see also inVentiv Health Consulting, Inc. v. Equitas Life Scis., 289 F. Supp. 3d 272, 284 (D. Mass. 2017) (explaining that the "legitimate advancement of [defendant's] own economic interest' does not constitute an improper motive") (quotation and quotation marks omitted), but no suggestion of threats, misrepresentation, defamation, retaliation or ill will.  First Citizens' tortious interference claim against CIBC, therefore, fails.

As to Onorato, First Citizens has plausibly alleged that Onorato used improper means to solicit its clients, because, as explained above, it has alleged that Onorato did so in violation of his Non-Solicitation Agreement.  See Cavicchi, 67 Mass. App. Ct. at 657.  First Citizens also plausibly alleged that it suffered alleged harm in the form of lost clients as a result of Onorato's alleged solicitation.  See D. 1 ¶¶ 48-52, 55, 59.  Accordingly, First Citizens has plausibly alleged its tortious interference claim as against Onorato.

For the aforementioned reasons, Defendants' motion to dismiss Count IV is allowed as to First Citizens' claim against CIBC and denied as to First Citizens' claim against Onorato.

**C.      Counts V, VI and VII:  Breach of Duty of Loyalty, Breach of Fiduciary Duty, and Aiding and Abetting Claims**

In Counts V and VI, First Citizens alleges that Onorato breached a duty of loyalty and fiduciary duty owed to First Citizens by soliciting First Citizens clients on behalf of CIBC and providing CIBC with confidential information to solicit the clients.  D. 1 ¶¶ 95-102.  In Count VII, First Citizens further alleges that CIBC aided and abetted these breaches.  Id. ¶¶ 103-08. Defendants move to dismiss these claims on the grounds that First Citizens fails to plausibly allege its breach of fiduciary duty claims against Onorato and, accordingly, also cannot allege its aiding and abetting claim against CIBC.  D. 28 at 18-20.  To establish a claim for breach of fiduciary duty or loyalty, First Citizens must prove that (1) Onorato had a duty to First Citizens; (2) Onorato breached that duty; (3) First Citizens suffered damages; and (4) Onorato's breach caused First Citizens' damages.  See Hanover Ins. Co. v. Sutton, 46 Mass. App. Ct. 153, 164 (1999).

As to the first element, "employees who occupy positions of trust and confidence, such as officers, directors, executives, or partners, owe a duty of loyalty to their employer."  Koch Acton, Inc. v. Koller, No. 21-cv-10374-FDS, 2024 WL 1093001, at *10 (D. Mass. Mar. 13, 2024) (citing Sterling Research, Inc. v. Pietrobono, No. 02-cv-40150-FDS, 2005 WL 3116758, at *10 (D. Mass. 2005); Chelsea Industries, Inc. v. Gaffney, 389 Mass. 1, 11 (1983)).  First Citizens has plausibly alleged that Onorato owes a duty of loyalty to First Citizens as a Managing Director "trusted . . . with the responsibility of managing assigned clients' accounts" and "permitted to access, utilize, and further develop First Citizens' proprietary and confidential information."  D. 1 ¶¶ 28-30. Moreover, the Non-Solicitation Agreement specifies that Onorato remained a First Citizens employee and "owe[d] the Company a duty of loyalty" throughout the Notice Period, D. 1-2 ¶ 3, thus Onorato continued to owe First Citizens a duty of loyalty until at least March 20, 2025.

19

As to the second element of breach of that duty, an employee in a position like Onorato's here "may not solicit his employer's customers while still working for his employer, appropriate his employer's trade secrets, or carry away certain information, such as lists of customers." People's Choice Mortg., Inc. v. Premium Cap. Funding, LLC, No. 06-3958-BLS2, 2010 WL 1267373, at *12 (Mass. Super. Mar. 31, 2010).  Nor can such an employee "act for his future interests at the expense of his employer by entering into a course of conduct designed to hurt his employer."  Id.  Here, as explained above, First Citizens plausibly alleges that Onorato solicited its clients during the Notice Period.  Thus, First Citizens has plausibly alleged the second element. As to the third and fourth elements, as explained above, First Citizens plausibly alleges that it suffered damages resulting from Onorato's alleged solicitation.    Accordingly, First Citizens has plausibly alleged its breach of fiduciary duty and breach of duty of loyalty claims against Onorato (Counts V and VI).

First Citizens has not, however, plausibly alleged its aiding and abetting claim against CIBC (Count VII).  To prevail on a claim for aiding and abetting a breach of fiduciary duty, First Citizens must prove:  (1) breach of a fiduciary duty by Onorato; (2) CIBC knew about the breach; and (3) CIBC "actively participate[d] or substantially assist[ed] in or encourage[d] the breach to the degree that [it] could not reasonably be held to have acted in good faith."  Arcidi v. National Ass'n of Gov't Employees, 447 Mass. 616, 623-24 (2006).  For the reasons explained above, the first element is plausibly alleged.  First Citizens has failed, however, to plausibly allege that CIBC knew about the breach.  Even accepting First Citizens' proposition that CIBC "was put on notice of Onorato's contractual obligations," D. 31 at 19, the client emails that First Citizens relies upon as evidence of Onorato's breach, see D. 1 ¶¶ 47-52, pre-date both Onorato's January 30, 2025 confirmation that CIBC understood his obligations during the Notice Period, id. ¶ 54, and First

20

Citizens' March 4, 2025 further communication to CIBC, id. ¶ 56.  Although First Citizens further alleges that "First Citizens clients that Onorato serviced continued to transfer their accounts to CIBC" following these exchanges, id. ¶¶ 55, 59, it fails to allege that these clients did so as a result of Onorato's CIBC-aided solicitation, beyond mere conjecture.  Absent allegations plausibly demonstrating that CIBC actively participated in, substantially assisted or encouraged Onorato's breach of his contractual obligations to First Citizens, it has failed to allege its aiding and abetting claim plausibly against CIBC.  Accordingly, Count VII is dismissed.

### D.    Count VIII:  Unjust Enrichment

In Count VIII, First Citizens alleges that Defendants have been unjustly enriched by First Citizens' confidential, proprietary and trade secret information.  Id. ¶¶ 109-12.  "[U]njust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience."  Doe v. Tenet Healthcare Corp., 731 F. Supp. 3d 142, 150 (D. Mass. Apr. 23, 2024) (quoting Sacks v. Dissinger, 488 Mass. 780, 789 (2021)). Under Massachusetts law, a plaintiff "must show (1) a benefit conferred upon defendant by plaintiff, (2) an appreciation or knowledge by defendant of the benefit, and (3) that acceptance or retention of the benefit under the circumstances would be inequitable without payment for its value."  Infinity Fluids Corp. v. Gen. Dynamics Land Sys., Inc., 210 F. Supp. 3d 294, 309 (D. Mass. 2016) (internal citation omitted).  "'Massachusetts courts have recognized that misuse of confidential information may lead to unjust enrichment.'"  Walgreen Co. v. Haseotes, 778 F. Supp. 3d 264, 295 (D. Mass. 2025) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc. (II), 552 F.3d 47, 57 (1st Cir. 2009)).  "However, '[u]nlike trade secrets law, which will allow recovery against a defendant who received the plaintiff's trade secret from a third party, unjust enrichment requires that the plaintiff *directly* bestowed a benefit on the defendant.'"  Id. (quoting

21

KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC, No. 21-cv-10572-TSH, 2021 WL 2982866, at *16 (D. Mass. July 15, 2021) (alteration and emphasis in original)).  Defendants move to dismiss on the ground that First Citizens has failed to allege a benefit conferred by it to Defendants.  D. 28 at 20.

As to CIBC, First Citizens fails to allege that it directly conferred a benefit to CIBC.  See KPM Analytics N. Am. Corp., 2021 WL 2982866, at *16 (noting that "[n]o cause of action lies where a plaintiff discloses the trade secret to a third party, who then disclosed the trade secret to defendant").  Thus, this claim fails as against CIBC.  As to Onorato, dismissal of the unjust enrichment claim is warranted for a different reason.  As First Citizens has an adequate remedy at law, namely its breach of contract claim as to Onorato, dismissal of this equitable remedy is warranted.  See Tomasella v. Nestle USA, Inc., 962 F. 3d 60, 83 (1st Cir. 2020).  Accordingly, Count VIII is dismissed as to both Defendants.

### E.      Count IX:  Unfair Competition

In Count IX, First Citizens alleges that Defendants' conduct constitutes unfair competition. D. 1 ¶¶ 113-17.  Generally, to maintain a common law unfair competition claim under Massachusetts law, a plaintiff "may show either 'palming off' or that the features of the product in question have acquired a secondary meaning such that confusion as to its source is likely to arise if defendant is allowed to copy them."  Kazmaier v. Wooten, 761 F.2d 46, 52 (1st Cir. 1985) (quoting Pic Design Corp. v. Bearings Specialty Co., 436 F.2d 804, 807 (1st Cir. 1971) (emphasis in original)).  As Defendants note, D. 28 at 20-21, First Citizens fails to state a claim for common law unfair competition as it does not plead any facts to support a claim that Defendants either palmed off its products or created customer confusion.  See Am. Tel. & Tel. Co. v. IMR Capital Corp., 888 F. Supp. 221, 246 (D. Mass. 1995) (noting that "the gravamen of an unfair competition

22

claim is the likelihood of consumer confusion as to the source of . . . goods or services") (alteration, quotation and quotation marks omitted).

In its opposition, however, First Citizens suggests that its unfair competition claim is a statutory claim under Mass. Gen. Laws c. 93A, § 11.  D. 31 at 23.  Even assuming *arguendo* that First Citizens alleged a claim under Chapter 93A without having cited it in the complaint, see Open Software Found., Inc. v. U.S. Fid. & Guar. Co., No. 98-cv-11177-GA, 2001 WL 1298878, at *6 (D. Mass. Aug. 16, 2001) (noting that common law unfair competition claims and Chapter 93A unfair competition claims are distinct and declining to review plaintiff's allegations under common law where plaintiff presented Chapter 93A that "did not in any way suggest, or adumbrate, that [plaintiff] was making a common law unfair competition claim"), aff'd, 307 F.3d 11 (1st Cir. 2002), this claim too fails.  "Section 11 of Chapter 93A provides a cause of action to '[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of' a prohibited act or practice."  Cynosure, LLC v. Reveal Lasers LLC, 793 F. Supp. 3d 315, 347 (D. Mass. 2025) (quoting Mass. Gen. L. c. 93A, § 11) (alteration in original).  "To prevail on a § 11 claim, a plaintiff must prove 'three elements:  (1) the defendant engaged in an unfair method of competition or committed an unfair deceptive act or practice; (2) a loss of money or property was suffered; and (3) the defendant's unfair or deceptive method, act or practice caused the loss suffered.'"  Id. (quoting Anoush Cab, Inc. v. Uber Techs., Inc., 8 F.4th 1, 16 (1st Cir. 2021) (quotation omitted)).

As to CIBC, for the same reasons as explained above, First Citizens fails to allege conduct constituting an unfair or deceptive trade practice.  See Morrison v. Toys "R" Us, Inc., 441 Mass. 451, 457 (2004) (noting that "[a]n act or practice is unfair within the meaning of G.L. c. 93A if it is: (1) within the penumbra of a common law, statutory, or other established concept of fairness;

23

(2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people"). Thus, this claim fails as against CIBC. As to Onorato, the majority of First Citizens' allegations against Onorato fall outside of Mass. Gen. Laws c. 93A, § 11's scope because they arise out of an employment relationship. "To determine whether relief under section 11 is prohibited by the employer-employee relationship, a court must determine whether, taken as a whole, the allegations are characterized fairly as arising out of an employment contract." Downing v. Omnicare, Inc., 299 F. Supp. 3d 218, 231 (D. Mass. 2017) (internal citation and quotation marks omitted). Here, Onorato's alleged conduct occurred while Onorato was still a First Citizens employee, and is mainly premised on his alleged breach of his Non-Solicitation Agreement with First Citizens. Thus, the majority of First Citizens' allegations against Onorato fall outside Chapter 93A's reach. See id.; Scansoft, Inc., 2005 WL 6719813, at *5 (dismissing claim based on "individual defendants' breach of their employment agreements"). Although Massachusetts courts have recognized an exception to the employment relationship bar "[w]here an employee misappropriates his or her employer's proprietary materials during the course of employment and then uses the purloined materials in the marketplace," Governo L. Firm LLC, 487 Mass. at 195; see, e.g., Specialized Tech. Resources, Inc. v. JPS Elastomerics Corp., 80 Mass. App. Ct. 841, 847 (2011) (finding that employee who obtained trade secret during course of employment and misappropriated it in violation of confidentiality provision of employment contract was liable under Mass. Gen. Laws c. 93A, § 11), as explained above, First Citizens has failed to allege that Onorato misappropriated its Confidential Information. Thus, this claim also fails as against Onorato. Accordingly, First Citizens has failed to state an unfair competition claim under either common law or Mass. Gen. Laws c. 93A, § 11.

For the reasons stated above, Count IX is dismissed.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss as to Counts I and IV in part, and as to Counts II, III, VII, VIII and IX in whole, and DENIES the motion as to Counts I (breach of contract claim as to Notice Period obligations and solicitation against Onorato) and IV (tortious interference claim as to Onorato) in part, and as to Counts V (breach of the duty of loyalty claim against Onorato) and VI (breach of fiduciary claim against Onorato) in whole. D. 27.[6]

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

---

[6] Having ruled on Defendants' motion to dismiss, the Court DENIES Defendants' motion for a protective order to stay discovery pending resolution of their motion to dismiss, D. 36, as moot. The Court further ALLOWS Plaintiffs' motion for a scheduling conference pursuant to Local Rule 16.1. D. 35. A separate order setting the scheduling conference will issue.